Welcome. We're glad to have you here today. We've got a fairly short argument calendar this morning. We've got two cases submitted on the briefs, and one case previously on the calendar has been dismissed with the consent of the parties. The first case on the day sheet, McCalla v. Royal Maccabees Life Insurance Company, has been submitted on the briefs. The second case on the day sheet, Valenzuela Garcia v. Ashcroft, has been dismissed at the request of the parties. The first argued case is, and I'm not sure I'm pronouncing it right, Borog-Perez v. Ashcroft. When you're ready. Good morning, Your Honors. I'm Sharon Dulberg, appearing on behalf of Belinda Borog-Perez, the petitioner in this case. Your Honors, the BIA erred in this case in two main ways. It imbued its discretion in two main ways. The first, as a matter of law, the BIA failed to follow its own presidential decision in matter of LOG. And matter of LOG is clear that when the BIA is presented with an application for the first time, when an applicant is asking for the opportunity to present their case for the first time before the immigration judge, that the burden is a lower burden. And the BIA in matter of LOG looked at Abudu, it looked at Daugherty, it looked at Coelho, and it said that those cases are different because they did not involve an applicant who was presenting his application for the first time. It involved, in all three of those cases, it involved an applicant who had either declined to present their asylum application intentionally and knowingly, or an applicant who had withdrawn their asylum application, or an applicant who already had the opportunity to present their application in Coelho. They had the opportunity to present the 212c, and they wanted a second opportunity to present new evidence. But in matter of LOG, the applicant was asking to present their application for the very first time before an immigration judge, and LOG said in that instance they look at all the factors in the case and they do not apply such a heavy burden. And that's what we have here today in Burak's case is she's asking the court, she was asking the BIA for the opportunity to present her case for the very first time before an immigration judge because she was denied that opportunity based on the ineffective assistance of counsel, and the BIA in her case did not follow its usual precedent, and it applied a higher standard than it should have in making its determination. What the court ---- Kagan. Isn't the problem that this particular kind of ineffective assistance, which is that the lawyer did not inform her that she would have an asylum claim, right? Yes, Your Honor. Is one that would be subject to the lawyer's judgment, i.e., the lawyer may have thought she didn't really have a viable asylum claim? Yes, Your Honor. However, in this case, if you look at the previous attorney's declaration, he said very clearly that he just wasn't familiar with the law and that until he was doing the research on his second and one of his briefs, he realized that asylum was available to people who ---- based on sexual orientation, and at that point he called Ms. Warragh in and sat down and spoke with her and asked her if she was afraid to go back to the Philippines based on her sexual orientation, and she indicated that she was, and that's when he referred the case out because he realized that he had failed to previously advise her of the opportunity to apply for asylum. In other words, we know that there was no tactical decision made or no judgment made. There was clearly no tactical decision in this case, Your Honor. And again, what the court said in matter of LOG very clearly was that the immigration judge is the place to hear the evidence in a case for the first time. When an applicant hasn't had the opportunity in the past, that the immigration court is the place to hear the evidence, to develop the facts. When there's questions of sufficiency of the facts, when there's ambiguities, that the case should be remanded to the immigration judge to make a decision on those factors, because the live testimony of the applicant is the most important thing, and the immigration judge is the only place to hear the live testimony to develop the facts, to give the applicant the opportunity to present all evidence in support of her case, and then to make a decision based on the entire record. And so you do have an obligation to at least demonstrate that there is some possibility of relief, but how would you articulate the standard? The standard as laid out, I would say, in matter of LOG is that the applicant needs to present specific non-conclusory allegations supported by the affidavit and other documentation that would support a reasonable likelihood that the statutory requirements may be met. But, again, LOG said really clearly that when they reopen a case in this situation, it doesn't mean that they believe that the applicant is going to be successful in the merits, but that there is. In fact, in matter of LOG, they said that you look at all the factors. You look at whether there's dilatory factors involved. You look at whether it's the first time the applicant is presenting this application. And you look at whether there's a reasonable likelihood. And when you include all the factors, you determine whether to remand it. And that's what matter of LOG also really focused on, that it said specifically none of the dilatory factors found in Abudu and Coleo existed in LOG. And so what would you say in basically what we have here for our record is her affidavit and some country report information. And none of the country report information seemed to be the country report information. So how would you summarize how that demonstrates a reasonable likelihood of success? Ms. Boragg is a lesbian from the Philippines, and she explained in her affidavit that she's had to hide her sexual orientation her entire life while she lived in the Philippines. She hid her sexual orientation because she feared that if she didn't hide it, she wouldn't be able to find work. She would be ostracized from society, which she was in any case because she was not able to completely hide her sexual orientation. And now after having lived in the United States, she's been in a relationship for the last 29 years. If she were to return to the Philippines, she's even less able to hide her sexual orientation. She's noticeable as a lesbian. And so she would not be able to find work. She would, as she explained in her affidavit, she was not able to practice in her She's not practicing her profession here, though, is she? No, she is not, Your Honor. She's a security guard. The real question isn't so much whether she could practice her profession as whether she would really be entirely without work. Yes. I think she believes that she would be entirely without work, but I believe she gave up her profession, one, because she was not able to practice it in the Philippines and I don't know that she was able to practice it here. And I believe the country conditions support as well, although they certainly can be developed before an immigration judge, but the country condition reports are fairly strong. I mean, they talk about times when people, when gays and lesbians are banned from towns, when they're being hounded for having caused tornadoes. There's paramilitary groups that were involved in both of those incidents. Not anywhere she ever was. At this, well, actually in Manila, there were also incidences of hounding of gays and lesbians where they hang out. And so I believe that there is country condition reports that, again, show at least that there's enough to develop this record further before an immigration judge, and that's what I think LOG really goes to. LOG said when there's a question about the sufficiency of the evidence, such as an LOG, there was a question about whether the children spoke Spanish, whether they spoke English, and what LOG said was that you remand it to the immigration judge to develop those facts before a body. In addition, I am going to ask that I can reserve two minutes for a rebuttal, but in addition, there was ineffective assistance of counsel in this case, and I believe there was prejudice. I think the prejudice is shown in two ways. One, because I think this case should have been remanded, but also because I think that this circuit's precedent shows that when the ineffective assistance of counsel led to the denial of an opportunity or the failure to file an application, that the prejudice is if the outcome of the situation might have been different. And the way I see the Ninth Circuit is looking at these cases is that the failure to file an application suggests that the outcome would have been different, even if it doesn't mean that the applicant would have won. And I think Dieringer, Castillo, and also Rodriguez-Larez all go to that point that, especially in Dieringer, the failure to file a petition for review in and of itself was the prejudice, that they were denied the opportunity to present their application or present their appeal. I'd like to reserve, Your Honor. We'll now hear from the government. Good morning, Your Honors. My name is Carol Federighi. I'm from the Department of Justice, representing Respondent John Ashcroft in this matter. What's at issue here, Your Honors, is the Board's motion – the Board's denial of Petitioner's motion to reopen her proceedings so that she could seek asylum. Her proceedings began over 10 years ago, when she was first served with an order to show cause in 1992. I get to what, for me at least, is the core of the matter, and that is, why, in your view, is there not a prima facie case that would allow her, then, at least to present this to the IJ? Okay. Petitioner admits that she was never physically harmed. She was never arrested or detained or even threatened while she lived in the Philippines because of her sexual orientation. She testified only that she was harassed and ostracized in school, but, in fact, she did finish school and obtained a professional degree. Now, if she had been physically hurt by agents of the government – this is a hypothetical, you understand – would she be able to state a claim? That is to say, is her sexual orientation a protected category? Yes. Her sexual orientation is a protected category. So that's off the table as an issue. The real issue is the degree of threat to her. Right. The issue is the level of violence that she experienced and or would experience if she returned. But it's not violence. And whether it was – We definitely have case law suggesting that at some level economic discrimination can be a basis for a persecution finding, right? Well, as Your Honor pointed out, she – on the economic issue, she testified that she lost patients from her dental practice. However, there was no indication that the government was involved in that in any way, that these were – it was nothing more than personal bigotry by her patients. And the case law is clear that there has to be some either governmental involvement in the actions or government willingness to tolerate it or unwillingness to stop it. And there's no indication – I think the test is inability or unwilling. Yes. That's correct, Your Honor. That's the correct formulation. And there's no indication here of government inability or unwillingness to control discrimination against gays and lesbians. Could such a record be developed? Your Honor, first, before – again, the test is that she has to make a prima facie case before the board to get a motion to reopen. And she did not present any indication that she had such evidence that she could develop before the immigration judge. Therefore, she failed to meet her prima facie case. How would that consist of? It would consist of showing that she'd gone to some body in power and to complain about this? Yeah. That would be one way to show she'd gone to the – But that's simply the fact that they didn't have any laws to discourage her. There was nobody to go to because they don't have any rule against her. Well, there – she didn't present any evidence about the laws of the Philippines and how they would have prevented her from achieving redress for her injuries. What the evidence shows, the country conditions evidence that she showed indicates that, well, yes, there's some isolated incidents of mistreatment of homosexuals in the Philippines. But, you know, as you're aware, there are those here also. It shows that there is an active gay rights movement in the Philippines. In 1997, there was a week-long gay rights demonstration, and that was supported by many straight people and businesses in the Philippines. There were 15 gay and lesbian rights organizations that participated in that and that have been active in the Philippines in supporting gay rights. So that – and there was – let me get the page numbers for you. There was actually – the country condition report also stated there were some statements that the Philippines are actually more tolerant than similar countries. That's on page 78. And that the gays are more accepted there. That's on page 71. And I remind Your Honors that she has not been in the Philippines since 1988. And the country condition evidence is much more recent and shows that life is tolerable for gays and lesbians in the Philippines. As far as the economic harm, as Your Honor pointed out, she has not worked as a dentist since she left the Philippines in 1988 – or 1986, actually, was the time that she really broke her ties with the Philippines. Since then, she has obtained work in many fields in the United States. She worked as a cashier and she's currently working as a security guard. These are types of employment that it should be – there's no evidence that she wouldn't be able to find employment doing those kinds of works in the Philippines. So there's the evidence of economic harm that she believes she would suffer if she returned to the Philippines is nowhere near high enough to make out a prima facie case of persecution. As for the standard that the Board used, the Board did use the appropriate standard looking for whether she had made out a prima facie case of persecution. And that's the standard that LOG talked about and it's the standard that this Court has applied. The Board several times stated that it was looking for a prima facie case. There's no indication that the Board applied the wrong standard, which plaintiff asserts – Petitioner asserts that the Board applied a conclusive – a standard that Petitioner was required to make a conclusive showing of eligibility for asylum. The Board did not apply that standard. Well, the BIA's – I'm not sure the BIA's reasoning really is consistent with our case law because they say a deprivation of employment or educational opportunities faced by an alien generally does not constitute persecution. And that isn't strictly true as we've already established, i.e., if she could demonstrate that she really couldn't get a job at all, that might well suffice, would it not? I'm not sure of that, Your Honor. However, she has not made that showing. I understand that, but I'm talking about the ground on which the BIA denied that she said that they applied the right standard. And I'm suggesting that they might not have applied the right standard. I just read what they – what the BIA opinion says. It's a deprivation of employment or educational opportunities faced by an alien generally does not constitute persecution. I think as a general statement, that is a correct statement of the law. If you look at the Nogolco case, and I have a say, it's 333 F. 3rd at 1012. In that case, she was – the Petitioner in that case was fired from her job. She was – it was religious persecution. And she was fired from her job because of that. She managed to obtain another job successfully. So in that case, as in this case, perhaps the Petitioner is not able to work in her chosen field and might be fired from some jobs, but that – in Nogolco, she was able to obtain another job. And this Court held that that was not sufficient to constitute persecution. Again, in this case, there's no evidence that she would fall into the narrow category of people that couldn't obtain any work at all in the Philippines. She didn't present any evidence of that at all. She merely talked about her dental – having trouble with her dental practice back in the early 80s. And as I said, I don't think that's relevant anymore to her situation. Kagan. Does she – does the Petitioner need to show ineffective assistance of counsel as a gateway to get into the Bonifacio case? I understand that the BIA has assumed that she did that. But does she need to show that? Yes. She did need to show it in the sense – because it pertains to the one-year requirement. She was – you're required to have filed your application, your asylum application within one year of your arrival in the U.S. or within one year of the law that passed that requirement, which she did not do. And so the ineffective assistance of counsel pertained to her lateness of filing. And the Board held that it wasn't – it was just going to assume that she met the exceptional circumstances exception to the one-year rule and moved on. But it didn't only pertain to that. It also pertained to not having done this previously. Well, the – her argument, I guess, is that she wasn't allowed to present her case in the first instance before the immigration judge. That – on that point, the Board found there was no – or on that point, we've argued that there's no prejudice, because she hasn't even shown that she would have had a prima facie case that would even – that at this point even merits hearing by the immigration judge. So, again, we don't need to reach the issue of whether she had ineffective assistance of counsel. I guess the question is, I mean, her affidavit says at the end, I would not be able to find a job given my appearance because it would be immediately suspected that I am gay. Right? That's her statement. The – either the BIA discounted that as not being within her can or something or said it wasn't enough. It's hard to tell from the BIA opinion which one it was doing. But what – how would one show – let's suppose that was the fact, that she could – if she went back to the Philippines, she couldn't get a job. How would she show that now at this preliminary stage? What would she have to do in order to get over the hump to get a hearing before an IJ? Well, I can't really speak to that until there's a case before the Board and the Board makes a decision on this is enough and that's not enough. But she – there's a flat statement in here. That's her statement.  That's her statement. How do you say the BIA didn't think it was good enough? Why wasn't it good enough? Right. To show a well-founded fear of future persecution, you have to show subjectively that you do actually fear going back to your country. And there's an objective branch also. You have to show that objectively the facts support your fear of mistreatment if you return. So the Board held that – I mean, again, the Board didn't analyze it expressly this way, but her statement goes to her subjective fear of going back. And she's making a statement of fact. It may be right or wrong, but she's making what appears to be a statement of fact. But that statement, that's her belief. And it goes – and it's contradicted by the country condition evidence in the record, which shows that there's active gay rights movements in the Philippines. There's no widespread systematic persecution. There's no gay rights movement because there's a problem. Well, there's a gay rights movement here also. That's right. And there are problems here. And a lot of the issues that are highlighted in the country conditions reports are the same as the issues here, gay marriage and gays in the military. Those are big issues in the Philippines also. But there's no indication in the reports. She didn't come forward with any articles or any kind of report that the employment situation for gays and lesbians was intolerable. So there's no objective. So what you're saying is that she would need to come in with some information other than her own say-so to demonstrate that she wouldn't get a job. Yes. Or if she was going to rely on her own say-so, there would have to be some showing that she had looked into the matter. I mean, she hasn't been back to the Philippines since 1988. There's no evidence that she did any sort of research into what the job situation was there. I'm having trouble getting my footing here, though, because I understand it more readily if the question were sort of on the merits. But this is a question of a prima facie case. Right. Obviously, if all you have to show is a prima facie case, you don't have to show as much as if you were actually showing it on the merits. And I understand everything you say would be relevant to a showing on the merits of the ultimate disposition. Right. But it's not enough that she states as a matter of fact that this is so? And again, without contradiction. I mean, I don't think there's any contrary evidence in the record. Well, we need to also go back to this Court's standard of review on a motion to reopen is an abuse of discretion standard. And the question is whether the Board abused its discretion in holding that the evidence that she submitted did not make it a prima facie case. And I'm out of time, so I just want to close by referring the Court to a passage in INS v. Avidu, which is a reopening case in which the Court noted that there's the INS has a right to be just restrictive in granting motions to reopen because granting such motions too freely will permit endless delay of deportation by aliens creative and fertile enough to continuously produce new and material facts sufficient to establish a prima facie case. I mean, the other thing about this case is that most of the delay seems to have been due to the fact that she was helping the INS with some investigations. Is that right? Well, the only evidence on that is the statement in her first attorney's declaration. She never brought this up. And he talked about when she first – if I can just get my notes on the timeline. He said that she was – oh, I didn't take – put notes. But basically until 1992, between 1998 and 1992, he asserted that she provided some kind of assistance to the INS and that in response to that, she was granted – she was permitted to stay and then granted – once an origin show cause was filed, then she was granted voluntary departure. And that was extended up until 1995. So you're right, she did get – if that's true that she helped the INS, that was part of the reason that she was allowed to stay until 1995. And you have no evidence that it's not true? No, I have no evidence that it's not true. But she did not raise it in her declaration or anything like that. So I don't know what the true story is there. But we believe the Board's decision should be upheld. The Board did not abuse its discretion. Thank you, Your Honor. Thank you. You've saved about two minutes. Excuse me? You've saved about two minutes. Thank you, Your Honor. A couple of just rebuttal points is that in LOG, the court, the BIA was aware of ABUDU and it said, you know, despite ABUDU, it distinguished the facts in LOG from ABUDU and it said that it does have a lighter burden when it's an applicant's first time applying for a form of relief. In addition, I think this back-and-forth over the country conditions, because I would say that the country conditions show that from 1994 until the present that there has been mistreatment of gays and lesbians in the Philippines. There is evidence in the record that officers in the Western District, I believe, of Manila have put officers who are under surveillance in the police force for homosexual activity. That's in the record at page 78. There was a 1997 order to purge gays from the police force. And again, that's at page 1978. These factors are questions for the immigration judge to decide. And again, as the Court stated, there is no contradictory evidence to Borag's statements in her affidavit that if she were to return to the Philippines, she would not be able to find work. And that is something, again, that needs to be developed before an immigration court. And just in closing, Your Honors, I just want to say that, you know, as an LOG, Borag submitted specific non-conclusory allegations supported by affidavits, not just her own affidavit, but there are several affidavits from other people who also make statements about the situation in the Philippines. There are statements such as, people in the Philippines do not tolerate gay life. This is considered abnormal and a mortal sin. So there are several other affidavits from other people supporting her asylum application. And as an LOG, there are no dilatory tactical – there are no – there was no dilatory tactical issues. I mean, it seems to me that nothing other than the economic discrimination, if one could establish it and if one could also hook it to the government, could possibly survive here as a viable claim, because the sort of ostracism – I mean, the ostracism based on sexual orientation, A, may be just as true here, and B, doesn't seem to arise to the level of persecution. Do you disagree with that? Yeah. Your Honor, I actually believe that's something that could be developed more before the immigration judge. But I do believe that a person who's forced to hide their sexual orientation their entire life, that that can rise to the level of persecution. Just as if somebody were forced to hide their religion their entire life because they were afraid of mistreatment based on their religion, it's the same thing in terms of being forced to hide your sexual orientation. And, you know, according to Ms. Borog, if she were to go back, she would be in that same position of having to live essentially in hiding and not – in hiding of her sexual orientation. Okay. Thank you, Your Honor. There are no further questions. Thank you very much, both sides, for a good argument on both sides. The case of Borog-Perez v. Ashcroft is now submitted for decision.
judges: T.G. Nelson, W. Fletcher, Berzon